**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No.** |
| | ) | |
| **$115,800.00  IN U.S. CURRENCY** | ) | |
| **FUNDS SEIZED FROM SOUTH** | ) | |
| **GEORGIA BANK ACCOUNT** | ) | |
| **ENDING IN 0378, ET AL.** | ) | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

COMES NOW the United States of America, (the "United States" or the "Government"), by and through David H. Estes, United States Attorney for the Southern District of Georgia, and J. Bishop Ravenel, Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *In Rem*, with the following allegations:

**NATURE OF THE ACTION**

1.     *In Rem* civil forfeiture is permissible under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2.     The Defendants *In Rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C) on the grounds that the Defendant Property, as defined later herein, is proceeds traceable to and/or derived from theft and unlawful conversion of government property and conspiracy in violation of 18 U.S.C. §§ 641 and 371, respectively, and wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, respectively; and property involved

in money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

## THE DEFENDANTS *IN REM*

3.    Collectively, the Defendants *In Rem* (hereinafter, collectively the **"Defendant Property"**) represent the following assets:

    a.    $115,800.00 in U.S. Currency Funds from South Georgia Bank Account ending in 0378 (**"Account 1"**);

    b.    $21,263.24 in U.S. Currency Funds from First Citizens Bank and Trust Account ending in 2757 (**"Account 2"**);

    c.    $6,715.85 in U.S. Currency Funds from First Citizens Bank and Trust Account ending in 2888 (**"Account 3"**);

    d.    $3,168.33 in U.S. Currency Funds from First Citizens Bank and Trust Account ending in 2837 (**"Account 4"**);

    e.    $578.84 in U.S. Currency Funds from First Citizens Bank and Trust Account ending in 2896 (**"Account 5"**); and

    f.    $2,665.53 in U.S. Currency Funds from South Georgia Bank Account ending in 0360 (**"Account 6"**).

The **Defendant Property** was seized on or about July 22, 2022, from accounts held by South Georgia Bank and First Citizens Bank and Trust as the result of federal seizure warrants authorized on or about July 21, 2022 in the Southern District of Georgia.

## JURISDICTION AND VENUE

4.    The United States brings this action *In Rem* in its own right to forfeit the **Defendant Property**.

5.     This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345.

6.     The Court has jurisdiction over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

7.     The Court has *In Rem* jurisdiction over the **Defendant Property** pursuant to 28 U.S.C. § 1355(b).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because acts and/or omissions giving rise to the forfeiture of the **Defendant Property** occurred in this district.

## FACTS AND BASIS OF FORFEITURE

### Overview of Investigation

9.     This forfeiture action stems from the seizure of the **Defendant Property** which was determined to be proceeds traceable to and/or derived from wire fraud, and which was also related to the violations of other federal laws, currently under investigation by the Federal Bureau of Investigation ("FBI") and United States Department of Veteran's Affairs – Office of the Inspector General ("VA-OIG").

10.    Particularly, the **Defendant Property** is forfeitable to the United States, as proceeds traceable to and derived from theft and unlawful conversion of government property, conspiracy to commit theft and unlawful conversion of government property, wire fraud, and wire fraud conspiracy; and property involved in money laundering and money laundering conspiracy, relating to a scheme to

defraud the United States of money and its military veterans of monetary educational benefits.

11.     The House of Prayer Bible Seminary ("HOPBS"), their employees and agents, and others aiding and abetting and aided and abetted by HOPBS (collectively referred to as "HOPBS"), and its parent organization, House of Prayer Christian Churches of America, Inc. ("HOPCC"), their employees and agents, and others aiding and abetting and aided and abetted by HOPCC (collectively referred to as "HOPCC") committed crimes, in violation of 18 U.S.C. §§ 371, 641, 1343, 1349, 1956, and 1957, which caused the **Defendant Property** to be forfeitable to the United States.

12.     HOPBS has operated and may continue to operate locations in the Southern District of Georgia, including in Liberty and Richmond Counties.

13.     HOPCC is the parent organization of HOPBS.

14.     HOPBS and HOPCC have received money, including the **Defendant Property**, through this criminal scheme.

Background on VA Educational Benefits

15.     Under Title 38, United States Code, Chapter 33 ("Post-9/11 GI Bill"), the United States provides educational assistance by paying for tuition, housing costs, and other educational costs and fees for veterans of the United States Armed Forces and other eligible persons that meet certain qualifications (hereinafter both classes of persons are referred to as "veterans").  See 38 U.S.C. § 3311.

16.    The Post-9/11 GI Bill and its related regulations provide educational assistance to veterans and is administered by the Department of Veterans Affairs ("VA").

17.    On October 1, 2011, the VA implemented a significant change in the eligibility for receipt of Post-9/11 GI Bill benefits.  Effective that day, VA began paying Post-9/11 GI Bill benefits to individuals pursuing non-institute of higher learning (non-IHL), non-degree programs, to include non-college degree (NCD) schools or programs.  These benefits are commonly referred to as "Chapter 33 benefits."

18.    For individuals receiving Chapter 33 benefits, the VA pays the tuition and fee payment directly to the school on the enrolled veteran's behalf.  The VA covers the net costs for in-state tuition and fees or the annual maximum for the academic year, whichever is less for a NCD school.  See 38 U.S.C. § 3313(g)(3).  In addition to the tuition and fee payments, the VA also provides monthly housing allowance benefits to veterans who are enrolled in the NCD program on more than a half-time basis.  Id.  In addition, veterans enrolled in courses in a NCD program at a non-IHL school receive a lump-sum amount for books, supplies, equipment, and other educational costs in an amount equal to $83 for each month (prorated based on the veteran's VA benefit level).  Id.

19.    To be eligible for benefits specifically under the Post-9/11 GI Bill, a course of education must be approved "by the State approving agency (SAA) for the State where the educational institution is located," subject to limited exceptions.  38 U.S.C. § 3672(a).  In the state of Georgia, the SAA is the Georgia Department of

Veterans Service ("GDVS").  If an approved NCD school offers a course under a contract from a third party, the contractor must obtain its own VA approval from the SAA.  See 38 U.S.C. § 3680A(f)(2).

20.    The    Georgia    Nonpublic    Postsecondary    Education    Commission ("GNPEC") also exercises oversight authority regarding educational programs, including the program being run by HOPCC and HOPBS, and relates its findings to GDVS and, ultimately, to the VA.

21.    Non-accredited    institutions    seeking    approval    from    the    SAA    are evaluated in several areas to ensure that quality education is provided to veterans. For a school to obtain approval to offer a non-accredited course, the SAA must find upon investigation that the educational experience and qualifications of the school's instructors are adequate and that the instructors are of good reputation and character.  38 C.F.R. § 21.4254(c)(3), (c)(12).  As a result, the school must disclose this information to the SAA during the approval process.  See 38 C.F.R. § 21.4254(c)(3), (c)(12).  In practice, this is normally accomplished by the inclusion of a faculty section in the school's course catalog that is submitted to the VA for approval, which includes the name of the instructors and a short biography.

22.    Once the school's course of education has been approved, tuition assistance under the Post-9/11 GI Bill is paid directly to the school providing the course in the amount allowable under the statute.  See 38 C.F.R. § 21.9680(a)(1).  The VA will not pay educational assistance to NCD schools for courses offered by distance learning, See 38 C.F.R. § 21.4267, except for the time period from March 1, 2020,

through December 21, 2021 due to COVID-19 and Public Laws 116-128 and 116-140. Before assistance is paid out under the Post-9/11 GI Bill, however, the school must first certify the individual's enrollment in the approved program.  <u>See</u> 38 C.F.R. § 21.9680(b)(1).  Other benefits, including the housing allowance, funds for books and supplies, and other educational costs, are paid directly to the veteran.  <u>See</u> 38 C.F.R. § 21.9680(a)(2).

23.    The VA will not approve the enrollment of any veteran or other eligible person in any course for any period during which more than 85% of the students enrolled in the course are having all or part of their tuition, fees, or other charges paid to or for them by the school or the VA.  <u>See</u> 38 C.F.R. § 21.4201(a).  That is, at least 15% of students must not be receiving VA educational assistance.  Failure to adhere to this requirement, which is commonly referred to as the "85-15 rule," may result in the facility's future enrollments being suspended from receipt of VA educational assistance.  <u>See</u> 38 C.F.R. § 21.4201(g)(2).

24.    Each school that receives VA tuition assistance funds must designate a School Certifying Official who is responsible for the certification of beneficiaries of VA education benefits.  A school may designate more than one School Certifying Official.  An individual in a position of authority at the school must complete VA Form 22-8794, Designation of Certifying Official(s), in order to designate a School Certifying Official.  School Certifying Officials are required to submit initial enrollment documents for veterans within 30 days of the beginning of the term, keep the VA informed of the enrollment status of veterans, maintain current knowledge of

the VA rules and benefits, maintain records of veteran and non-veteran students (student or enrollee not using VA education benefits to pay for their program program), and make all records available for inspection at any time by the VA or the SAA.

25.     VA-ONCE is a web-based system, with servers based in Pennsylvania, that allows School Certifying Officials to create and transfer enrollment information directly to a VA Regional Office for processing. The VA-ONCE system requires the School Certifying Official to provide a username and password to access the system and transmit data to the VA. Each School Certifying Official has a unique username and password which allows him or her access to the system. Transactions originating or terminating outside the state of Pennsylvania with VA-ONCE cause interstate and/or foreign wires to occur. Additional interstate and/or foreign wires initiated from locations outside of Georgia also occur as a result of payments made by the VA for the educational benefits described herein.

26.     School Certifying Officials must complete VA Form 22-1999, VA Enrollment Certification, for each veteran who will receive VA tuition assistance funds. Using this form, School Certifying Officials certify the course in which the veteran is being enrolled, the start and end dates of the enrollment period, the number of hours per week the veteran will attend class, and the cost of tuition for the course. The School Certifying Official is responsible for notifying the VA of any changes in the information the official has certified. In addition, as of January 1, 2018, if the student graduates from the program, the School Certifying Official must

document this graduation on VA Form 22-1999b, Notice of Change in Student Status. See Public Law 114-315 § 404 (effective January 1, 2018).

27.     The School Certifying Official has the option of completing either a hard copy VA Form 22-1999 or the electronic version of the form available through the VA-ONCE system.  The hard copy form requires the School Certifying Official to provide his or her signature, while the electronic form requires the School Certifying Official to sign electronically.  The date of the electronic signature and the date the document is electronically received by the VA are recorded on the enrollment certification document.  By signing a VA Form 22-1999, either by hand or electronically, a School Certifying Official certifies that the veteran's course or courses are "generally acceptable to meet requirements for the student's educational, professional, or vocational objective," and that all the "85-15 ratio requirements have been satisfied."

28.     The educational facility is responsible for ensuring that veterans receiving VA tuition assistance do not make up more than 85% of their student population.  The VA does not track the number of non-veteran students, rather it relies solely on the representations made by the School Certifying Official on the Statement of Assurance of Compliance with 85 Percent Enrollment Ratios form, VA Forms 22-1999, and during VA compliance surveys, which are typically conducted on an annual basis.  These representations are material to the VA, because a school that did not comply with the rules would be ineligible to receive funds under the program.

HOPBS Relationship to VA Education Benefits and Payments

29.    HOPBS initially obtained approval to receive VA education assistance benefits by representing to the VA, among other things, that it was providing courses to veterans and other eligible persons that were taught by HOPBS instructors at HOPBS facilities.

30.    HOPBS represented to the VA that those facilities were located in Hinesville and Hephzibah, GA, within the Southern District of Georgia, and also in Fayetteville, NC, Killeen, TX, and Tacoma, WA.

31.    Upon each veteran's enrollment, a HOPBS School Certifying Official certified to the VA by way of VA Forms 22-1999 that each veteran was receiving the allotted hours of instruction consistent with the course for which the veteran had been approved.

32.    HOPBS then received direct tuition payments from the VA under the Post-9/11 GI Bill.

33.    According to documents provided by HOPBS to the SAA and subsequently the VA, HOPCC operates HOPBS.

34.    Between January 2013 and February 2022, approximately 304 veterans were enrolled in courses at HOPBS.

35.    VA enrollment certification records, certified by HOPBS School Certifying Officials, reflected that a majority of veterans were enrolled as full-time students at HOPBS requiring at least 18 hours of in-person attendance per week.

36.     From January 2013 to January 2022, VA paid veteran students enrolled at HOPBS under various VA education benefit programs approximately $15,952,721 in the form of tuition, housing allowances, and stipends.

37.     VA records indicate that from January 2013 to February 2022, VA issued tuition payments to HOPBS totaling approximately $6,916,303 for 210 veterans enrolled at HOPBS under the Post-9/11 GI Bill program and various other VA-sponsored educational benefits programs.

38.     HOPBS financial records and VA records reflect that from 2013 to 2016 the tuition payments from the VA to HOPBS for students receiving Post-9/11 GI Bill benefits grew substantially.

39.     From 2013 through 2022, HOPBS received the following monies from the VA in payments regarding the Post-9/11 GI Bill benefits:

   a.     For the calendar year 2013, the VA paid approximately $75,360 in Post-9/11 GI Bill benefits to HOPBS;

   b.     For the calendar year 2014, the VA paid approximately $442,355 in Post-9/11 GI Bill benefits to HOPBS;

   c.     For the calendar year 2015, the VA paid approximately $1,076,967 in Post-9/11 GI Bill benefits to HOPBS;

   d.     For the calendar year 2016, the VA paid approximately $1,146,165 in Post-9/11 GI Bill benefits to HOPBS;

   e.     For the calendar year 2017, the VA paid approximately $1,120,492 in Post-9/11 GI Bill benefits to HOPBS;

f.     For the calendar year 2018, the VA paid approximately $973,751 in Post-9/11 GI Bill benefits to HOPBS;

g.     For the calendar year 2019, the VA paid approximately $919,921 in Post-9/11 GI Bill benefits to HOPBS;

h.     For the calendar year 2020, the VA paid approximately $677,262 in Post-9/11 GI Bill benefits to HOPBS;

i.     For the calendar year 2021, the VA paid approximately $407,799 in Post-9/11 GI Bill benefits to HOPBS; and

j.     In January 2022, the VA paid HOPBS approximately $76,231 in Post-9/11 GI Bill benefits to HOPBS.

## Overview of Fraud by HOPBS and HOPCC

40.   During the course of this ongoing investigation, agents with the FBI and VA-OIG gathered evidence through interviewing witnesses, including but not necessarily limited to former students and employees of HOPBS, reviewing VA records, reviewing records from financial institutions, considering unsolicited complaints to the VA submitted through a VA online complaint system against HOPBS, and through other measures.

41.   Through the investigation, the FBI and VA OIG determined HOPBS made numerous false statements to the VA in order to establish HOPBS as an educational institution recognized by the VA and in order to secure regular payments from the VA under the Post-9/11 GI Bill program for educational services.

42.     Those education services were not performed to the standard required by the VA.

43.     HOPBS made the following materially false and fraudulent statements and representations, knowing then and there that such statements and representations were false, including through interstate wire communications, to the VA regarding the Post-9/11 GI Bill program, including but not limited to:

a.      overstating and otherwise misrepresenting the number of hours of instruction performed by HOPBS;

b.      misrepresenting the qualifications of faculty members of HOPBS;

c.      misrepresenting the facility locations of students enrolled at HOPBS;

d.      misrepresenting the facility locations of faculty members of HOPBS;

e.      misrepresenting the time periods over which faculty members worked for HOPBS;

f.      misrepresenting the courses taught by faculty members;

g.      misrepresenting the courses available to students of HOPBS;

h.      misrepresenting the manner of instruction provided by HOPBS;

i.      misrepresenting the quality of instruction provided by HOPBS;

j.      misrepresenting the schedules of students of HOPBS;

k.      misrepresenting the nature of the HOPBS education program, including the requirements to successfully complete the program;

l.      misrepresenting the true content of courses, including by re-naming old courses to appear as new courses;

m.      falsifying attendance rosters for courses, including by falsely and fraudulent stating that certain students attended the courses when in fact they did not;

n.      falsifying financial records of payments by students to HOPBS;

o.      falsifying information and records bearing upon HOPBS's compliance with the "85/15 Rule";

p.      falsifying graduation and completion records of students of HOPBS; and

q.      falsifying course catalogs, including by providing false and misleading information regarding course names, content, and hours of instruction.

44.      Had HOPBS related truthful and accurate information, rather that the materially false statements and/or omissions in the preceding paragraph and sub-paragraphs, HOPBS would not have been certified to receive Post-9/11 GI Bill program benefits and would not have received money from the VA.

45.      HOPBS made the following materially false and fraudulent statements and representations, knowing then and there that such statements and representations were false, to the GNPEC, the Georgia entity overseeing postsecondary educational entities, which in turn resulted in false and fraudulent statements submitted by GNPEC to GDVS, the Georgia SAA, and ultimately to the VA, including through interstate wire communications, including but not limited to:

a. claiming HOPBS received no federal funds in applying for a religious exemption to GDVS oversight of its Hinesville, GA, educational program, within the Southern District of Georgia, in or about December 2011;

b. omitting that HOPBS ran a location in Hephzibah, within the Southern District of Georgia, in applying for the religious exemption to GNPEC in or about December 2011; and

c. claiming HOPBS received no federal funds in applying for renewals of its religious exemption to GNPEC oversight of its educational program, in or about December 2015, March 2017, December 2017, and January 2020.

46. Had HOPBS related truthful and accurate information, rather that the materially false statements and/or omissions in the preceding paragraph and sub-paragraphs, HOPBS would not have been authorized to operate in the state of Georgia and, as a result, would not have been certified to receive Post-9/11 GI Bill program benefits and would not have received money from the VA.

47. In addition, through interviews and the review of unsolicited complaints to the VA submitted through a VA online complaint system regarding HOPBS, the FBI and VA-OIG obtained the following information regarding HOPCC and HOPBS, including but not limited to:

a. HOPCC established locations in close proximity to military bases in order to target military service members and veterans;

b.      HOPCC targeted military service members and veterans, seeking to exploit them and deprive them of their benefits, including but not necessarily limited to housing benefits as service members and educational benefits as veterans;

c.      HOPCC used various psychological efforts, including public shaming, financial coercion, and control of minute aspects of the military members and veterans' lives in order to control and exploit them economically;

d.      HOPCC members were directed to enroll in HOPBS and to use their Post-9/11 GI Bill benefits to pay for HOPBS and cause direct payments to HOPBS and HOPCC.

e.      HOPBS directed students at HOPBS to falsify educational records, including attendance rosters, hours of instruction, and additional paperwork;

f.      HOPBS students were not provided with a pathway towards successful completion of the program and had their course plans changed without their input and consent;

g.      HOPBS denied and/or delayed providing students with documentation regarding their education, including transcripts and evidence of course and program completion;

h.      HOPBS misled students regarding the content of courses and the program, the students' freedom to choose courses, grading system, and qualifications of instructions, among other misrepresentations and false statements;

i.      HOPBS failed to provide grades to students and rarely tested them; and

j.      HOPBS falsified student records, including course attendance records and graduation records.

Defendant Property Nexus to Wire Fraud and Money Laundering

48.     VA records indicate that from October 2020 to June 2022, VA issued tuition payments to the **Accounts 2, 3, 4, and 5** totaling approximately $513,751 for veterans enrolled at HOPCC under the Post-9/11 GI Bill program.

49.     HOPCC is the account owner for **Accounts 2, 3, 4, and 5**, and has been the account holder during the time period payments were received from the VA for payments under the Post-9/11 GI Bill program.

50.     **Accounts 1 and 6** were controlled by HOPBS and HOPCC during the time period payments were received by HOPBS and HOPCC from the VA for payments under the Post-9/11 GI Bill program.

51.     In total, during the time period over which HOPBS and HOPCC received money from the VA for payments under the Post-9/11 GI Bill program, HOPBS and HOPCC controlled 80 or more bank accounts at 20 or more financial institutions; routinely opened and closed accounts; and frequently transferred and deposited VA funds to and from multiple HOPBS and HOPCC controlled bank accounts.

52.     HOPBS and HOPCC controlled and used even more bank accounts, which have not been associated at this point in the investigation with monies received from the VA.

53.     Many of the transactions appeared to have no business purpose and served the effect of distancing the bank accounts and funds from the initial receipt of

the payments from the VA and concealing the VA as the initial source of that money as well as the nature of the money.

54.   During the time period over which HOPCC and HOPBS received Post-9/11 GI Bill program funds from the VA, **Accounts 1 through 6** were involved in monetary transactions involving more than $10,000, which constituted or was derived from proceeds traceable to violations of 18 U.S.C. §§ 371, 641, 1343, and 1349, including:

      a.   **Account 1** transferring over $10,000 on approximately 13 occasions to other HOPCC and/or HOPBS accounts, and conducting deposits of over $10,000 on approximately 8 occasions;

      b.   **Account 2** transferring over $10,000 on approximately 11 occasions to other HOPCC and/or HOPBS accounts, and conducting deposits of over $10,000 on approximately 16 occasions from other HOPCC and/or HOPBS accounts;

      c.   **Account 3** transferring over $10,000 on approximately one occasion to another HOPCC and/or HOPBS account;

      d.   **Account 4** transferring over $10,000 on approximately eight occasions to other HOPCC and/or HOPBS accounts;

      e.   **Account 5** transferring over $10,000 on approximately two occasions to other HOPCC and/or HOPBS accounts, and conducting a deposit of over $10,000 on approximately one occasion from another HOPCC and/or HOPBS account; and

f.   **Account 6** transferring over $10,000 on approximately five occasions to other HOPCC and/or HOPBS accounts, and conducting deposits of over $10,000 on approximately two occasions from other HOPCC and/or HOPBS accounts.

55.   The VA paid approximately $208,320 during the time period of 2020 through 2022 into **Account 2** under the Post-9/11 GI Bill program.

56.   The VA paid approximately $60,457 during the time period of 2020 through 2022 into **Account 3** under the Post-9/11 GI Bill program.

57.   The VA paid approximately $152,500 during the time period of 2020 through 2022 into **Account 4** under the Post-9/11 GI Bill program.

58.   The VA paid approximately $92,474 during the time period of 2020 through 2022 into **Account 5** under the Post-9/11 GI Bill program.

59.   The VA also paid approximately $4.7 million under the Post-9/11 GI Bill program into bank accounts controlled by HOPCC and/or HOPBS between March 2015 and October 2020, which accounts are listed as Subject Accounts 1, 2, 3, and 4 below.

60.   The VA paid approximately $821,990 between March 2015 and August 2019 under the Post-9/11 GI Bill program into a Chase Bank account ending in 8352 ("Subject Account 1").

61.   The VA paid approximately $2,704,872 between April 2015 and June 2020 under the Post-9/11 GI Bill program into a Suntrust/Truist account ending in 0040 ("Subject Account 2").

62.     The VA paid approximately $927,247 between April 2015 and October 2020 under the Post-9/11 GI Bill program into a Bank of America account ending in 0803 ("Subject Account 3").

63.     The VA paid approximately $248,972 between June 2016 and July 2017 under the Post-9/11 GI Bill program into a Bank of America account ending in 4594 ("Subject Account 4").

64.     Subject Accounts 1, 2, and 3 also transferred $767,903 in money traceable to VA payments under the Post-9/11 GI Bill program to a Wells Fargo Bank account ending in 2120 ("Subject Account 5"), which was controlled by another entity.

65.     Subject Account 5 transferred $96,000, via a check, in July 2020, to **Account 1**, which monies were traceable to payments from the VA under the Post-9/11 GI Bill program.

66.     Subject Accounts 1 through 5 were used to conceal and funnel the monies received from the VA to additional bank accounts controlled by HOPCC and/or HOPBS.

67.     **Account 6** was also used to conceal the monies received from the VA and received approximately $59,829 from Subject Accounts 1 through 4 traceable to monies from the VA to Subject Accounts 1 through 4 under the Post 9/11 GI Bill program.

68.     **Account 1** was also used to conceal the monies received from the VA and received approximately $96,000 from Subject Account 5 traceable to monies from the VA to Subject Account 5 under the Post 9/11 GI Bill program.

69.   Through numerous materially false and fraudulent statements and omissions, including but not necessarily limited to those set forth in the above paragraphs, HOPBS and HOPCC defrauded the United States of money and its veterans of monetary educational benefits, including the **Defendant Property**, which includes proceeds and/or property traceable to proceeds of theft and unlawful conversion of government property, conspiracy to commit theft and unlawful conversion of government property, wire fraud, and wire fraud conspiracy; and is property involving in money laundering and money laundering conspiracy.

70.   **Accounts 1 through 6** as well as Subject Accounts 1 through 5 contain and constitute property that was involved in money laundering offenses, including conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

71.   **Accounts 1 through 6** as well as Subject Accounts 1 through 5 contain and constitute property that was proceeds traceable to and/or derived from theft and unlawful conversion of government property, conspiracy to commit theft and unlawful conversion of government property, wire fraud, and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 371, 641, 1343, and 1349.

72.   By the foregoing and other acts, the **Defendant Property** is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) on the grounds that the **Defendant Property** is proceeds traceable to and/or derived from violations of 18 U.S.C. §§ 371, 641, 1343, and 1349; and property involved in violations of 18 U.S.C. §§ 1956 and 1957.

## CLAIMS FOR RELIEF

First Claim for Relief
(Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C))

73.     The United States incorporates by reference the allegations contained in paragraphs 1 through 72 above as if set forth fully herein.

74.     The **Defendant Property** is property that constitutes and/or is derived from proceeds traceable to violations of 18 U.S.C. §§ 371, 641, 1343, and 1349.

75.     The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

Second Claim for Relief
(Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

76.     The United States incorporates by reference the allegations contained in paragraphs 1 through 72 above as if set forth fully herein.

77.     The **Defendant Property** is property that is involved in and/or traceable to transactions or attempted transactions of a value greater than $10,000 in property derived from specified unlawful activity, including but not limited to violations of 18 U.S.C. §§ 371, 641, 1343, and 1349, in violation of 18 U.S.C. § 1957.

78.     The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

Third Claim for Relief
(Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

79.     The United States incorporates by reference the allegations contained in paragraphs 1 through 72 above as if set forth fully herein.

80.     The **Defendant Property** is property that is involved in, and/or is traceable to transactions or attempted transactions designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, including but not limited to violations of 18 U.S.C. §§ 371, 641, 1343, and 1349, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

81.     The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

<u>Fourth Claim for Relief</u>
(Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A))

82.     The United States incorporates by reference the allegations contained in paragraphs 1 through 72 above as if set forth fully herein.

83.     The **Defendant Property** is property involved in a conspiracy to commit violations of 18 U.S.C. § 1956(a)(1)(B)(i) and § 1957, in violation of 18 U.S.C. § 1956(h).

84.     The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## <u>CONCLUSION</u>

85.     WHEREFORE, the United States of America prays that:

a.      Process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the **Defendant Property**;

b.      The **Defendant Property** be forfeited and condemned to the use and benefit of the United States;

c.      The United States be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper; and

d.      That due notice be given to all parties to appear and show cause why the forfeiture of the **Defendant Property** should not be decreed.


Respectfully submitted,

DAVID H. ESTES
UNITED STATES ATTORNEY

By:     */s/ J. Bishop Ravenel*
J. Bishop Ravenel
Assistant United States Attorney
Virginia Bar Number 70250
P.O. Box 8970
Savannah, GA 31412
(912) 652-4422

## VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM*

I, Special Agent Douglas R. Dye, have read the foregoing Complaint for Forfeiture *In Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 6th day of January 2023.

_____
DOUGLAS R. DYE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION